**Pierce Bainbridge Beck Price & Hecht LLP**
John M. Pierce (SBN 250443)
jpierce@piercebainbridge.com
Carolynn K. Beck (SBN 264703)
cbeck@piercebainbridge.com
Maxim Price (*pro hac vice*)
mprice@piercebainbridge.com
John Dillon (*pro hac vice*)
jdillon@piercebainbridge.com
Melissa Giger (*pro hac vice*)
mgiger@piercebainbridge.com
Nadia Klein (*pro hac vice*)
nklein@piercebainbridge.com
355 S. Grand Ave., 44th Floor
Los Angeles, California 90071-1505
(213) 262-9333
*Attorneys for Plaintiff*
*Stiletto Television, Inc.*

THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **Stiletto Television, Inc.,** a California corporation,<br><br>plaintiff,<br><br>v.<br><br>**Hastings, Clayton & Tucker, Incorporated,** a Nevada corporation, dba **Stiletto Entertainment; and Does 1-25,** inclusive,<br><br>defendants. | Case No. 2:18-cv-3911-DSF-PLA<br>Hon. Dale S. Fischer<br><br>**Stiletto Television, Inc.'s Memorandum of Points and Authorities in Opposition to Hastings, Clayton & Tucker, Inc.'s Motion for Summary Judgment** |

1

**Stiletto Television, Inc.'s Memorandum of Points and Authorities
Fact in Opposition to Hastings Clayton & Tucker, Inc.'s MSJ**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

[Declarations of Maxim Price
and Troy P. Queen in support
hereof; and Statement of
Genuine Issues of Material Fact
in Opposition to Hastings,
Clayton & Tucker, Inc.'s Motion
for Summary Judgment filed
concurrently herewith]

**Stiletto Television, Inc.'s Memorandum of Points and Authorities
Fact in Opposition to Hastings Clayton & Tucker, Inc.'s MSJ**

**<u>TABLE OF CONTENTS</u>**

I.    Introduction ……………………………………………………1

II.    Background…………………………………………………3

    A. The Formation of Stiletto Television, Inc……………….3

    B. The Creation of *Barry Manilow: Music and Passion*….3

        1.    STV approaches Barry Manilow to star in its first creative program…………………………………………..3

        2.    STV retains producer Paul Morphos and director David Mallet to shoot Music and Passion……………….4

        3.    STV contracts PBS to televise Music and Passion…………………………………………………….5

        4.    STV Contributes to the Creation of Music and Passion……………………………………………………5

    C. STV's Contributions To Music And Passion Are Recognized………………………………………………6

        1.    STV receives recognition for its contribution to Music and Passion……………………………………….6

    D. STV Creates *Barry Manilow: Songs From the Seventies*…………………………………………………..7

    E. Course of Conduct After the Creation of *Songs From the Seventies*……………………………………………9

III.    Argument……………………………………………………10

    A. HCT's Argument is Premised on a Legal Fiction…….10

        1.    HCT's Provides no Objectively Verifiable Evidence……………………………………………….10

        2.    STV Owns the Copyrights to the Works………11

**Stiletto Television, Inc.'s Memorandum of Points and Authorities**
**Fact in Opposition to Hastings Clayton & Tucker, Inc.'s MSJ**

a.    Manilow and HCT do not have a copyright claims in the works because STV repudiated any copyright more than a decade ago .......12

b.    The recent assignments by Morphos, Mallet, and Manilow to HCT are not valid.............15

3.    In the Alternative, STV is an "author" of each of the films.....................................................16

a.    STV's Contributions Would Also Qualify as a Joint Author..........................................17

b.    STV owns the copyrights that would have otherwise vested in Mallet and PJM...........19

IV.   Conclusion...............................................................20

**Stiletto Television, Inc.'s Memorandum of Points and Authorities
Fact in Opposition to Hastings Clayton & Tucker, Inc.'s MSJ**

1

# <u>Table of Authorities</u>

2 **Cases**                                                    Pages

3 <u>Zuill v. Shanahan,</u>

4     80 F.3d 1366, (9th Cir.(Cal.) 1996)……………………………12

5 <u>Aalmuhammed v. Lee,</u>

6     202 F.3d 1227, (9th Cir.(Cal.) 2000)……………………12, 17

7 <u>Seven Arts Filmed Entertainment Ltd. v.</u>

8 <u>Content Media Corp. PLC,</u>

9     733 F.3d 1251, (9th Cir.(Cal.) 2013)……………………….....12

10 <u>Silva v. Sunich,</u>

11     WL 6116645 (C.D.Cal. Sep. 06, 2006)……………………….13

12 <u>Ritchie v. Williams,</u>

13     395 F.3d 283 (6th Cir.(Mich.) 2005)……………………….…13

14 <u>Morrill v. Smashing Pumpkins,</u>

15     57 F.Supp. 2d 1120, (C.D.Cal. 2001)………………….....…17

16 <u>Community for Creative Non-Violence v. Reid,</u>

17     490 U.S.730, 109 S. Ct. 2166, (U.S.Dist.Col. 1989)…………..20

18

19 **Statues and Regulations**

20

21 17 U.S. C. § 507(b)……………………………………………………2, 11

22 17 U.S.C. § 101…………………………………………………….....16

23

24 **Rules**

25

26 Fed. R. Civ. P. 26(a)…………………………………………………2

27

28

**Stiletto Television, Inc.'s Memorandum of Points and Authorities**
**Fact in Opposition to Hastings Clayton & Tucker, Inc.'s MSJ**

1    Plaintiff Stiletto Television, Inc. ("Plaintiff" or "STV") respectfully

2  submits this opposition to the Motion for Summary Judgment filed by

3  defendant Hastings, Clayton & Tucker, Inc. ("Defendant" or "HCT")[1].

4  **I.    <u>Introduction</u>**

5    This is a civil action for declaratory relief arising out of a dispute

6  over U.S. copyrights in two films created by Plaintiff, *Barry Manilow:*

7  *Music and Passion Live from Las Vegas* ("*Music and Passion*") and

8  *Barry Manilow: Songs from the Seventies* ("*Songs from the Seventies*")

9  (together, the "Films").  (*See* generally Dkt. No. 1).  Defendant filed its

10  Motion for Summary Judgment (the "Motion") requesting that this

11  Court find as a matter of law that it is the exclusive owner of the

12  copyright in the aforementioned Films, while simultaneously

13  invalidating Plaintiff's lawful copyright registration in the Films.  For

14  the reasons explained in this memorandum and on the strength of the

15  evidence adduced in discovery, Defendant has not established any basis

16  for summary judgment because there exist triable issues of fact as to

17  whether STV owns the copyright. As such, its motion should be denied.[2]

18    Defendant's Motion is based entirely on serial misstatements of

19  both facts and law.   Defendant's Motion relies singly on  an

20  unsupportable legal fiction: that this case is between Barry Manilow

21

22  [1] In Defendant's opening brief, Defendant HCT is referred to by an
   abbreviation of its d.b.a. Stiletto Entertainment ("Stiletto"). Because
23  this can create confusion as between Stiletto Television and Stiletto
   Entertainment, Plaintiff refers to Defendant as "HCT" or "Defendant."
24
25  [2] Defendant filed its motion for summary judgment on the last possible
   day to do so and refused to even discuss a motion for an extended
26  briefing schedule despite leaving Plaintiff with under a week to
   oppose. Plaintiff may request additional briefing if relevant discovery
27  is adduced during the remaining two depositions ordered by the Court
   of Garry and Rob Kief. Declaration of Maxim Price ¶ 2.
28

**Stiletto Television, Inc.'s Memorandum of Points and Authorities
Fact in Opposition to Hastings Clayton & Tucker, Inc.'s MSJ**

1  and the individuals Mark Grove and Troy Queen rather than between
2  the companies HCT (a management company that has Barry Manilow
3  as one of its clients) and STV (comprised of Garry Kief, Mark Grove,
4  and Troy Queen).   Motion at 1 line 14.   Furthermore, documentary
5  evidence and witness testimony show that Garry Kief, Barry Manilow,
6  and HCT agreed that STV was the exclusive owner of the copyrights in
7  both of the Films.   Copyright ownership accrues only once – when a
8  work is created.   Both of the Films were created over twelve years ago.
9  Yet even though HCT and Barry Manilow, both in close relationship
10  with STV, knew from inception that STV claimed and openly used
11  exclusive ownership of the Films, thereby expressly repudiating any of
12  their ownership claims, neither took any action within the three-year
13  statute of limitations.   Thus, a reasonable finder of fact could determine
14  that HCT's claim that STV is not the sole copyright owner of the Films
15  is barred under 17 U. S. C. § 507(b).   Neither Defendant's revisionist
16  history nor its creation of new, litigation-driven documents a few
17  months ago saves it from this result under the weight of the evidence
18  provided by Plaintiff.[3]

19      Even if HCT's claim in defense of this action were not barred by
20  the statute of limitations, sufficient evidence exists such that a
21  reasonable finder of fact could find for STV on other grounds discussed
22  below and, among other relief, invalidate HCT's 2016 copyright
23  registration.

24

25

26  [3] Despite agreeing to do so by April 3, 2019, HCT has not produced any
documents to date neither in response to STV's requests for production
27  nor in compliance with initial disclosures under Federal Rule of Civil
Procedure 26(a). Declaration of Maxim Price ¶ 3.
28

– 2 –

1   II.   __Background__

2       **A.   The Formation of Stiletto Television, Inc.**

3          In late 2003, Troy Queen ("Queen") reconnected with long-time

4   fraternity acquaintance Garry Kief.  STV's Statement of Genuine Issues

5   of Material Fact in Opposition to HCT's Motion for Summary Judgment

6   ("SGIMF") ¶ 157.  A short time later, Queen and his partner Mark Grove

7   ("Grove")—who had been producing television news for NBC at the time

8   —were invited to Palm Springs, California to meet with Garry Kief

9   ("Kief") and Barry Manilow ("Manilow") to discuss forming a motion

10  picture production company.  SGIMF, ¶ 159.  Following a productive

11  meeting Queen, Grove, and Kief formed STV.  SGIMF, ¶ 160.  Each of

12  the three founders was a one-third shareholder in the company, which

13  remains true today.  *Id*.  Grove would focus more on the company's

14  creative programming, while Queen and Kief would focus primarily on

15  the company's financials.  Grove was responsible for creative, Queen for

16  logistics, and Kief was responsible for maintaining the corporate books

17  of STV through the accounting portion of his company, Defendant HCT

18  and made financial investments in STV.  SGIMF, ¶ 161.

19      **B.   The Creation of *Barry Manilow: Music and Passion***

20        **1. STV approaches Barry Manilow to star in its first**

21           **creative program**

22         In conjunction with the initial formation of STV, Grove, Queen

23  and Kief discussed potential opportunities to kick-start the business.

24  SGIMF, ¶ 162.  The trio, along with Barry Manilow, decided that STV's

25  first major project would feature Barry Manilow marking his longtime

26  return to television.  *Id*.  Barry Manilow later obtained a concert

27  residency at the Las Vegas Hilton, which turned out to be the perfect

28

– 3 –

**Stiletto Television, Inc.'s Memorandum of Points and Authorities**
**Fact in Opposition to Hastings Clayton & Tucker, Inc.'s MSJ**

1    opportunity for STV to move forward with its plan.  SGIMF, ¶ 163.

2         **2. STV retains producer Paul Morphos and director David**
3              **Mallet to shoot *Music and Passion***

4         Mr. Queen of STV and Mr. Sharell of HCT reached out to veteran

5    producer Paul Morphos ("Morphos"), Mr. Morphos's production

6    company "PJM" and director David Mallet to pitch the idea and have

7    them come see the show.  SGIMF, ¶ 22-25.   On November 30, 2005,

8    STV and PJM entered into a deal memorandum with respect to the

9    production of *Music and Passion*.   SGIMF, ¶ 164.   The deal

10   memorandum set out the initial terms of the engagement between STV

11   and PJM.   Under the expressed terms of the memorandum PJM

12   guaranteed to produce *Music and Passion* while STV retained all

13   ownership in the production.  *Id.*  This was done with the knowledge

14   and participation of HCT employees. SGIMF, ¶ 164.

15        In keeping with the deal memo, on or around January 12, 2006,

16   STV wrote to PJM to confirm the detailed deal points of their production

17   agreement for *Music and Passion*.   SGIMF, ¶ 165.   As part of the

18   agreement, Kief, Grove, and Queen would be Executive Producers and

19   members of the project's creative team.   (*See* Exhibit 8 to Morphos

20   deposition, clause 1.1.10).   Further, as part of the agreement PJM

21   assigned "irrevocably and exclusively… all right title and interest in

22   and to the programs…" and undertook to get the same assignment from

23   everyone he hired, including David Mallet.  SGIMF, ¶ 166-167.   Under

24   the production agreement's assignment, PJM also agreed that *Music*

25   *and Passion* was a program commissioned by STV and constituted a

26   work made for hire within the meaning of the United States Copyright

27   Act.  *See id.*  Garry Kief, who is also principal of defendant HCT, knew

28

**Stiletto Television, Inc.'s Memorandum of Points and Authorities**
**Fact in Opposition to Hastings Clayton & Tucker, Inc.'s MSJ**

1  of the existence of this agreement and even helped enforce its terms as

2  against Damon Whiteside without any objection. SGIMF, ¶ 169.

3      **3. STV contracts PBS to televise Music and Passion**

4          Upon recommendation from Morphos, and with help from their

5  agents at the William Morris Agency ("WMA"), Grove and Queen

6  reached out to the Public Broadcasting Service ("PBS") to gauge the

7  television network's interest in sponsoring *Music and Passion*.  From

8  October 2005 to December 2005, STV negotiated a purchasing and

9  licensing agreement with PBS for a television program featuring *Music*

10  *and Passion*.  SGIMF, ¶ 170.  An agreement between STV and PBS was

11  ultimately finalized in December 2005.   *Id*. As part of the final

12  agreement between PBS and STV, PBS committed $200,000 to the

13  project, which monies were deposited into STV's bank account.  SGIMF,

14  ¶ 171. This too was done openly and with the express approval of Garry

15  Kief. *Id*.  Importantly, STV would also retain all copyrights in *Music*

16  *and Passion* as part of the agreement with PBS.  SGIMF, ¶ 170, (Jones

17  Dep. Ex. 3 ¶ 2).  The PBS agreement was reviewed by all three STV

18  members, including Kief.  SIGMF, ¶ 171.

19      **4. STV Contributes to the Creation of *Music and Passion***

20          Queen and Grove of STV were significantly involved throughout

21  the pre-production, production, and post-production of *Music and*

22  *Passion*.  SIGMF, ¶ 172.  As he owed a fiduciary duty to STV, Garry

23  Kief contributed work and funds on behalf of STV as well.  *Id*.  As the

24  installation of the show began at the Las Vegas Hilton, Grove moved

25  from Los Angeles to Las Vegas. SGIMF, ¶ 173.  Grove brought with him

26  a camera kit, light kit, and an audio kit and documented the making of

27  *Music and Passion*. *Id*.  Grove used this equipment to film Mr. Manilow

28

**Stiletto Television, Inc.'s Memorandum of Points and Authorities
Fact in Opposition to Hastings Clayton & Tucker, Inc.'s MSJ**

1  and his backup singers and band doing rehearsals in the theater before
2  it was open to the public, and captured significant behind the scenes
3  footage documenting how the entire show came together into a film. *Id.*
4  The film shot by Grove was ultimately used in the PBS television special
5  and DVD. *Id.* No one else was involved in that filming, Mr. Grove did
6  it alone. Additionally, Grove participated in the lighting work for the
7  concert and worked extensively in the production of the concert shoot.
8  SGIMF, ¶ 39, 40. Following the completion of the shoot, Grove was
9  involved in the editing of the film at the editorial vendor Matchframe
10 studios, providing his own notes on the film's audio and picture.
11 SGIMF, ¶ 49

12     Queen was also significantly involved in the production of *Music*
13 *and Passion*. Queen was in charge of the logistics of producing the DVD
14 and PBS-specific filming and for the various DVD versions and regions.
15 SGIMF, ¶ 174. He worked with Morphos and Tom Davis on the camera
16 plots, budgeting, credits, seating, travel and setlist for the show. *Id.*
17 Furthermore, PJM provided proposed budgets for Queens approval. *Id.*
18 Whenever there was a change to the budget, or a last-minute
19 requirement that required additional money, Queen would be the one
20 to sign off on that change and coordinate the change. *Id.* For instance,
21 when an additional camera operator was needed, Queen approved and
22 organized it. *Id.*

23 **C. STV's Contributions to *Music and Passion* are**
24 **Recognized**

25 1. **STV receives recognition for its** contribution to *Music and*
26 *Passion*

27     In recognition of its contributions to *Music and Passion*, STV was

28

**Stiletto Television, Inc.'s Memorandum of Points and Authorities
Fact in Opposition to Hastings Clayton & Tucker, Inc.'s MSJ**

1    included on the program's DVD packaging and in the program's ending
2    credits. SGIMF, ¶ 175. Of note, Kief, Grove, and Queen were listed as
3    the executive producers in the very first single frame that rolls at the
4    film's ending credits. SIGMF, ¶ 61. Both the aforementioned DVD
5    packaging and credits were reviewed and approved by both Kief and
6    Manilow. SGIMF, ¶ 175.

7         *Music and Passion* was very well-received by the entertainment
8    industry, Manilow's fans, and by the public in general. Following *Music
9    and Passion's* release, STV initiated a multifaceted Emmy Awards
10   campaign. SIGMF, ¶ 176. Additionally, during the Emmy campaign
11   STV hired the Lippin Group, a renowned international corporate
12   communications and publicity company. STV worked closely with the
13   Lippin Group to create and publish advertisements for *Music and
14   Passion* in papers, magazines, and other media. All of the
15   advertisements and press releases identified *Music and Passion* as "a
16   Stiletto television production." SGIMF, ¶ 177. Additionally, all designs
17   of the press releases and Emmy submissions were approved by Barry
18   Manilow. *Id*. STV's efforts were ultimately successful as *Music and
19   Passion* earned two Emmy nominations, with Manilow receiving a 2006
20   Emmy. SIGMF, ¶ 176. During his acceptance speech, Manilow thanked
21   STV and both Grove and Queen by name. SGIMF, ¶ 178. The DVD of
22   *Music and Passion* went triple platinum. SIGMF, ¶ 179.

23        STV openly entered into and solely benefited from an exclusive
24   license agreement with Rhino in 2006 for the manufacturing and
25   distribution of *Music and Passion*. HCT knew about it, received the
26   royalty statements, deposited the royalties in STV's bank accounts and
27   never once objected in all of these years. SGIMF ¶ 79.

28

– 7 –

**Stiletto Television, Inc.'s Memorandum of Points and Authorities
Fact in Opposition to Hastings Clayton & Tucker, Inc.'s MSJ**

1  **D. STV Creates** *Barry Manilow: Songs From the Seventies*

2  After the tremendous success of *Music and Passion*, STV began

3  thinking about and working on the next Barry Manilow special as early

4  as November of 2006. SGIMF ¶ 90. *Songs from the Seventies* was not

5  based on a pre-existing show, rather, "the concert was created for

6  television." SGIMF, ¶ 91.

7  STV reunited the team that worked on *Music and Passion*, which

8  included hiring director Mallet and Morphos of PJM; But this time STV

9  hired each individual worker including Mallet and Morphos directly.

10  SGIMF, ¶¶ 92 and 93.  In the summer of 2007, Queen, on behalf of STV,

11  negotiated another deal with PBS whereby PBS would pay a fee of

12  $200,000 to STV and STV would retain the copyright in *Songs from the*

13  *Seventies*.  SGIMF, ¶ 124.   The terms of the deal were reviewed by

14  STV's agents at WMA and Garry Kief.  *Id.*  The deal letter with PBS

15  lists STV as the copyright holder.  *Id.*  Queen also negotiated the

16  agreement with Steiner studios, the sound stage provider where the

17  production was filmed. SGIMF, ¶ 96.  In August 2007, Queen also

18  entered into an amendment to the distribution agreement with Rhino

19  to add *Songs from the Seventies* to the products distributed by Rhino.

20  SGIMF, ¶ 181.

21  Queen and Grove were instrumental to the creation of *Songs from*

22  *the Seventies*.  In addition to pitching the project, negotiating the

23  agreement with PBS, hiring the production crew and the director, and

24  securing the location of the shoot, both Queen and Grove were involved

25  in the conception of the project at the pre-production stage and

26  coordinated the logistics of the show.  SGIMF, ¶¶ 90, 93, 96, 99, 100,

27  103, 104. They were constantly present during preparations and filming

28

**Stiletto Television, Inc.'s Memorandum of Points and Authorities**
**Fact in Opposition to Hastings Clayton & Tucker, Inc.'s MSJ**

1  and were involved in the financial and business aspect of the production
2  as well.  SGIMF, ¶ 100.  During post-production, they provided feedback
3  and oversaw important aspects of editing.  SGIMF, ¶ 106.

4       Moreover, STV funded the development and production of *Songs*
5  *from the Seventies*. Kief, a principal of STV who controlled its finances,
6  provided funds for the film through STV and had his staff book those
7  payments in STV's QuickBooks.  SGIMF, ¶ 94.  The profit and loss
8  account for STV breaks down the monies provided by STV for *Songs*
9  *from the Seventies*. *Id*. For example, STV paid director Mallet's fee of
10 $47,527 on October 9, 2007, PJM's producer fees of $32,500 on
11 September 24, 2007, and a total studio rental cost of $77,808.14 to
12 Steiner Studios in the fall of 2007.  *Id*. (*See e.g.* STV_CDCAL_0008492-
13 93, at 27, 30, 31).  After the show was completed, Queen and Grove
14 spearheaded the marketing and Emmy campaign that resulted in the
15 DVD going platinum, receiving an Emmy nomination, and being
16 broadcast on more television stations than *Music and Passion*. SGIMF,
17 ¶ 182.

18      **E.   Course of Conduct After the Creation of *Songs From the***
19           ***Seventies***

20      STV consistently asserted its copyright in *Songs from the*
21 *Seventies* and both Manilow and Kief acquiesced in those
22 representations.  The packaging of the DVD for *Songs from the*
23 *Seventies* clearly identifies the film as a "Stiletto Television production."
24 SGIMF, ¶ 184. STV conspicuously asserted and commercially exploited
25 the exclusive copyrights in *Songs from the Seventies* with the full
26 knowledge of and without any objection from HCT or Barry Manilow.
27 SGIMF, ¶ 184.  Moreover, and as noted above, Manilow directly
28

1    approved all documents and external communications bearing his name
2    or image. *Id.*

3    III.   **Argument**

4        **A. HCT's Argument is Premised on a Legal Fiction**

5        HCT begins its Motion by attempting, without any legal authority
6    or basis, to change the parties to this lawsuit.  HCT proclaims on the
7    first page of its motion that "[t]o be clear, this case is a copyright battle
8    between two former Manilow assistants, Troy Queen and Mark Grove,
9    on the one hand, and Barry Manilow, on the other."  This is blatantly
10   false. The Plaintiff here is STV, which includes as its owners and
11   employees, for the time period relevant to this dispute, Troy Queen,
12   Mark Grove, Garry Kief, and other employees including Jonathan
13   Parkman, and Matthew Schwartz. Garry Kief's contributions to STV
14   are not negated merely because, as HCT appears to argue, he was
15   involuntarily removed from the board of directors nearly a decade after
16   the events relevant to this lawsuit took place.[4]

17       Moreover, Barry Manilow is not a party.  HCT supports this game
18   of 3-card-monty by stating that HCT is Mr. Manilow's "business arm."
19   First, there is no such mechanism that would permit one party to stand
20   in for another.  And even if there was, Mr. Manilow has several other
21   corporations through which he runs his business, including BMPI, Inc.
22   and Obbligato. SGIMF, ¶ 13.   This lawsuit is about HCT and its
23   improper use of copyrights that belong to STV.

24       Without evidence or legal support for these changes in legal
25   structure, HCT cannot support its Motion.

26   ――――――――――――――
27   [4] STV will not burden the Court with a rebuttal to Defendant's false
     claims regarding why Mr. Kief was involuntarily removed from STV's
28   board in 2014 because it is irrelevant to this action.

― 10 ―

1      ### 1.    HCT's Provides no Objectively Verifiable Evidence

2      HCT's Motion relies on a statement of purportedly uncontroverted

3      facts that are mere opinions of biased witnesses.  One of HCT's main

4      arguments is that STV does not hold any copyright interest in *Music*

5      *and Passion* because it completed *no* work at all to create the work. To

6      support this, HCT provides the testimony of Mssrs. Mallet, Morphos,

7      and Ciancimino—individuals who have either a business relationship

8      or a personal relationship, or both, with Mr. Manilow. SGIMF, ¶ 61.  To

9      make matters worse, HCT relies on copyright assignments that it

10     obtained from Messrs Morphos and Mallet mere weeks before their

11     depositions in this matter. SGIMF, ¶ 52.  The remainder of HCT's

12     statement of uncontroverted facts largely comprises cites to Mr.

13     Manilow or Mr. Kief's declarations.  The credibility of HCT's principal,

14     his husband and their potential business partners is squarely within

15     the purview of a finder of fact.

16     ### 2.    STV Owns the Copyrights to the Works

17     There is ample evidence that since the creation of each of the

18     Films, STV has held itself out as the exclusive owner of the copyrights

19     as demonstrated below.  There is also no dispute that STV and HCT

20     were in close relationship, and that despite knowing of and

21     participating in STV's assertion that it was the sole copyright owner,

22     HCT did nothing to contest STV's ownership or to assert its own claim

23     for copyright ownership within the three year period following each of

24     the Film's creation.  Accordingly, notwithstanding the genuine issues of

25     fact surrounding the creation of each of the Films as detailed above, the

26     Motion, HCT's or Barry Manilow's attempt to assert that they are the

27     copyright owner of the Films is barred by the Copyright Act's statute of

28

**Stiletto Television, Inc.'s Memorandum of Points and Authorities
Fact in Opposition to Hastings Clayton & Tucker, Inc.'s MSJ**

1    limitations.  17 U.S.C. § 507(b).

2               a. Manilow and HCT do not have a copyright claims in

3                 the works because STV repudiated any copyright

4                 more than a decade ago

5    Courts have concluded that claims for co-ownership accrue only

6    once, "when plain and express repudiation of co-ownership is

7    communicated to the [alleged co-owner], and are barred three years

8    from the time of repudiation." *Zuill v. Shanahan,* 80 F.3d 1366, 1369

9    (9th Cir. 1996); see also *Aalmuhammed v. Lee*, 202 F.3d 1227, 1230-31

10    (9th Cir. 2000) (Where "creation rather than infringement is the

11    gravamen of an authorship claim, the claim accrues on account of

12    creation, not subsequent infringement, and is barred three years from

13    'plain and express repudiation' of authorship.")  While *Zuill* and

14    *Aalmuhammed* both involved claims of co-ownership, the Ninth Circuit

15    has extended this rule to also include claims of sole ownership.  *Seven*

16    *Arts Filmed Entm't, Ltd. v. Content Media Corp. PLC*, 733 F.3d 1251,

17    1258 (9th Cir. 2013) (untimely claim will bar a claim for copyright

18    ownership when the parties are in a close relationship).

19    HCT and Manilow are barred from raising objections now.  By

20    HCT's own admission, STV is the only entity that has ever collected

21    royalties from the commercial exploitation of the films.  STV did not pay

22    Manilow or HCT any portion of the royalties it received. SGIMF, ¶¶ 79,

23    126.  Manilow and HCT have never raised an objection or demanded to

24    be paid royalties.  This case is quite unique in that the party now

25    complaining that this repudiation was unfair had every opportunity to

26    act on the repudiation within the statutory time period.  STV's

27    repudiation was done in full open view of Garry Kief, HCT, and Barry

28

**Stiletto Television, Inc.'s Memorandum of Points and Authorities
Fact in Opposition to Hastings Clayton & Tucker, Inc.'s MSJ**

1   Manilow. Garry Kief, who is the sole shareholder of HCT, Barry
2   Manilow's self-proclaimed "business arm" and his husband, reviewed
3   the contracts, received the statements from licensees outlining royalty
4   payments due, and booked the royalty revenues in STV's accounting
5   software ("QuickBooks"), and deposited the monies in STV's account.
6   *Id.*   HCT, Garry Kief, and Barry Manilow are barred from raising
7   objections three years after the 2006 repudiation for *Music and Passion*
8   and 2007 repudiation for *Songs from the Seventies* effected by STV.
9   *Seven Arts*, 733 F.3d at 1257 (Seven Arts knew of Paramount's interest
10  in, and distribution of, the pictures during the statutory period, and
11  knew that Paramount was not paying royalties to Seven Art's
12  predecessors); Silva *v. Sunich*, No. CV 03-9327 GPS (CWX), 2006 WL
13  6116645, at *6 (C.D. Cal. Sept. 6, 2006) (finding that failure to pay
14  royalties constituted repudiation of co-ownership and commenced the
15  statute of limitations period.)

16      Furthermore, STV consistently represented, with HCT's and
17  Manilow's knowledge and acquiescence, that it was the sole copyright
18  owner of each of the films.  *See Zuill*, 80 F.3d at 1368 (finding plain and
19  express repudiation where defendants sent to plaintiffs an agreement
20  providing that defendant was the sole author of the works); *Ritchie v.*
21  *Williams,* 395 F.3d 283, 288 (6th Cir. 2005) (finding plain and express
22  repudiation where plaintiff had expressly told the defendants, in a
23  letter, that plaintiff had exclusive ownership of the composition he had
24  written).

25      For each film, STV entered into a number of agreements that
26  called for STV to retain exclusive ownership of the copyright, and Garry
27  Kief and employees of HCT reviewed and approved these agreements.
28

– 13 –

**Stiletto Television, Inc.'s Memorandum of Points and Authorities
Fact in Opposition to Hastings Clayton & Tucker, Inc.'s MSJ**

1   For example:

2    1.    STV and PBS entered into an agreement by which STV
3    retained all copyrights in *Music and Passion*.  (SGIMF, ¶
4    170, (Jones Dep. Ex. 3 ¶ 2)).   The PBS agreement was
5    reviewed by all three STV members, including Kief. SGIMF,
6    ¶ 124.

7    2.    Kenny Pyle, an employee of Stiletto Entertainment,
8    worked   on   the   agreement   between   STV   and   DVD
9    distribution   company   3DD   that   gave   3DD   exclusive
10    international rights over *Music and Passion. Id.*

11    3.    STV and PBS entered into an agreement by which STV
12    retained all copyrights in *Songs from the Seventies*. *Id.* The
13    terms of the deal were reviewed by STV's agents at WMA
14    and by Garry Kief. *Id.* The deal letter with PBS lists STV as
15    the copyright holder.  *Id.*

16    4.    The agreement between STV and Steiner studios,
17    where *Songs from the Seventies* was filmed, assigns all
18    intellectual property rights to STV.  SGIMF, ¶ 96. Tucker
19    Cheadle and Tom Ugland, HCT's attorneys, reviewed the
20    agreement. *Id.*

21    5.    The Copyright Statement between STV and Sony
22    DADC US Inc. states that STV is the copyright holder for
23    *Songs from the Seventies.* SGIMF, ¶ 184.

24    6.    Kenny   Pyle,   along   with   attorney,   drafted   an
25    agreement between STV and Manilow's musicians by which

26

27

28

**Stiletto Television, Inc.'s Memorandum of Points and Authorities
Fact in Opposition to Hastings Clayton & Tucker, Inc.'s MSJ**

1   the musicians assigned their rights to STV.[5]  SGIMF, ¶ 109.
2   Pyle sent the draft agreement to Queen and Kief for their
3   review. *Id.* At his deposition, Pyle testified that "it would
4   have been a big no-no" to make any decisions related to
5   contracts without consulting Kief. *Id.*

6   Moreover, the packaging for the DVDs clearly show that STV
7   claims exclusive copyright ownership of the film, and STV received top
8   billing in the credits for each of the productions. SGIMF, ¶ 61, 97. Two
9   HCT employees worked with Grove and Queen on the back-cover art for
10  *Songs from the Seventies*, which lists STV as the sole copyright holder.
11  SGIMF, ¶ 125.  Rob Kief, brother of Garry Kief and Executive Vice
12  President of Stiletto Entertainment, worked on the credits for *Songs*
13  *from the Seventies*, which include the mention of Stiletto Television as
14  the sole copyright holder. *Id.*

15  Defendant cannot now claim, more than a decade after STV's clear
16  and express repudiation, that HCT and Manilow have an ownership in
17  the copyrights of the films. These defenses are time-barred—and have
18  been for years.

19             b. The recent assignments by Morphos, Mallet, and
20                Manilow to HCT are not valid

21  HCT fails to mention in its Motion that the written agreements
22  signed by Manilow, Mallet, and Morphos that allegedly assign their
23  copyright to Defendant are dated February 1, 2019. These assignments
24  cannot be valid for several reasons.

25

26  [5] While the draft agreement does not specify which recordings are
    covered by the agreement, the date of the emails and the forward-
27  looking discussion suggest that the agreement was drafted in
    preparation for *Songs from the Seventies*.
28

– 15 –

1    *First*, and as explained above, these individuals did not, as of
2    February 2019, own a valid copyright in *Music and Passion* and *Songs*
3    *from the Seventies*. Any claims to copyright ownership, to the extent
4    they ever existed, were assigned to STV or have been time-barred for
5    years.  Manilow, Morphos, and Mallet cannot assign a copyright they
6    do not own.

7    *Second*, even if they did at some point own copyrights to the films,
8    Morphos, on behalf of PJM, and Mallet had previously assigned them
9    to STV.

10   *Third*, Mallet and Morphos did not understand what they were
11   signing and the agreements were obtained by fraud.  Mallet testified
12   that he understood at the time he was working on *Songs from the*
13   *Seventies* that he would not be retaining his copyright in the work and
14   that he was assigning the works to someone else, though he doesn't
15   know or care to whom that assignment was made. SGIMF, ¶ 92 (Mallet
16   Dep. 79:6-11).  Morphos testified that he knows "virtually nothing"
17   about copyright law and believed that he signed a renewal of the
18   assignment that he had previously signed. SGIMF, ¶ 107.

19   **3.    In the Alternative, STV is an "author" of each of the**
20   **films**

21   For a work to be characterized as a joint work, (1) there must be a
22   copyrightable work, (2) two or more authors, and (3) the authors must
23   intend their contributions to be merged into inseparable or
24   interdependent parts of a unitary whole.  17 U.S.C. § 101 (1976).  Courts
25   have looked at the following criteria to determine whether a contributor
26   is an author:  (1) whether the purported author controls the work and
27   is the inventive or master mind who creates or gives effect to the idea,
28

**Stiletto Television, Inc.'s Memorandum of Points and Authorities**
**Fact in Opposition to Hastings Clayton & Tucker, Inc.'s MSJ**

1   (2) whether the putative coauthors make objective manifestations of

2   shared intent to be coauthors, and (3) whether the audience appeal of

3   the work turns on both contributions and the share of each in its success

4   cannot be appraised. *Aalmuhammed v. Lee,* 202 F.3d 1227, 1234 (9th

5   Cir. 1999). In "[t]he case of a music video is equally clear: absent a

6   written agreement, the copyright for the music video is a joint

7   ownership between the performing artists and the video's producer

8   (assuming an original contribution by the producer or an employee of

9   the producer)." *Morrill v. Smashing Pumpkins*, 157 F. Supp. 2d 1120,

10  1126 (C.D. Cal. 2001).

11              a. STV's Contributions Would Also Qualify as a Joint

12                 Author

13  If no repudiation has occurred, the contributions of STV

14  throughout the entire pre-production, production, and post-production

15  processes of both *Music and Passion* and *Songs from the Seventies*

16  clearly establish it as a joint author.

17  For example, Grove personally filmed a variety of content, with

18  his own hands holding a camera, that ultimately comprised the

19  "making-of" portion of the second DVD in the *Music and Passion* two-

20  DVD set, and was used in the PBS television broadcast. This footage

21  includes, the scenes created by Mr. Grove depicting the making of the

22  *Music and Passion* film, shots of Manilow and his backup singers and

23  band doing rehearsals in the theater before it was open to the public,

24  interviews with the cast and crew working on the show, as well as hours

25  of behind the scenes footage documenting how the entire show came

26  together, all invented and brought to life by Mr. Grove.

27  During the production and filming of *Music and Passion*, Queen

28

**Stiletto Television, Inc.'s Memorandum of Points and Authorities
Fact in Opposition to Hastings Clayton & Tucker, Inc.'s MSJ**

1  and Grove provided input on camera plots, lighting choices, timing and
2  arrangement of the various segments, the arrangement of the various
3  chapters of the show, and the PBS pledge breaks.  It was during these
4  pledge breaks that Queen and Grove would often assist in drafting
5  questions and answers for interview with Manilow.

6  During the post production of the show, Grove and Queen were
7  also involved in the audio mixing and syncing, organizing audience
8  shots and color correction for *Music and Passion*.  Mr. Grove testified
9  that he spent countless hours and many a sleepless night in the editing
10  room.  This work was done for every version of the show including the
11  PBS broadcast version, the U.S. DVD version, and the International
12  DVD regional versions.  For both versions of the DVDs, Grove and
13  Queen were also intimately involved in designing the DVD packaging
14  and the DVD menus.  This work included the designing the overlapping
15  dual DVDs layout, the DVD jacket, and the booklets included with each
16  DVD.  These designs were distinct among all other Manilow DVDs.

17  Moreover, STV paid for all costs and expenses for *Songs from the
18  Seventies*, and STV directly hired and controlled the individuals,
19  including Mallet and Morphos, who worked on the production.  SGIMF,
20  ¶ 94.  All of the contributions by STV, including Grove and Queen were
21  invaluable to the overall quality and uniqueness of the Film and
22  ultimately led to the programs' Emmy Award winning success.

23  There is something unique about what Mark Grove and Troy
24  Queen bring to the table.  STV has had wild success in creating
25  television programming (SGIMF, ¶ 185) and the two Films at issue here
26  stand out from all of the other Manilow films in their wide appeal and
27  success (SGIMF, ¶ 176, 178, 179, 183).  A jury may very well find that
28

– 18 –

**Stiletto Television, Inc.'s Memorandum of Points and Authorities
Fact in Opposition to Hastings Clayton & Tucker, Inc.'s MSJ**

1  it was STV employees that caught the lightning in a bottle that made

2  *Music and Passion* and *Songs from the Seventies* special.

3  　　　　　　　　　　　　b. STV owns the copyrights that would have otherwise

4  　　　　　　　　　　　　　　vested in Mallet and PJM

5  　　　　Even assuming, *arguendo*, that the copyright ownership of each of

6  the works vested only in Manilow and Mallet[6] under a theory of joint

7  authorship, summary judgment cannot be granted in favor of HCT

8  because Mallet assigned his copyright in the films to STV.

9  　　　　Mallet and Serpent were hired by Paul Morphos of PJM.  PJM was

10  hired by STV to produce both *Music and Passion* and *Songs from the*

11  *Seventies*.  The deal memo between STV and PJM is dated November

12  30, 2005, and was signed by Queen on behalf of Stiletto Television and

13  Morphos on behalf of PJM.  The deal memo states that "STV shall be

14  said owner of the above-mentioned Program." SGIMF, ¶¶ 58, 164, and

15  166.  Morphos produced at his deposition a "more or less final version"

16  of the production agreement that was "certainly very close to a final

17  version."  SGIMF, ¶ 35.  This production agreement contains an

18  assignment clause that calls for PJM and "each and every person

19  engaged by [PJM]" to assign "all right, title, and interest in" *Music and*

20  *Passion* to STV.  SGIMF, ¶ 36.  At his deposition, Morphos confirmed

21  that this agreement was finalized and signed.  SGIMF, ¶ 35.  Morphos

22  also testified that he entered into an agreement with Mallet.  SGIMF,

23  ¶ 35, 36, and 57.

24  　　　　STV and PJM had a similar arrangement for *Songs from the*

25  *Seventies*.  STV commissioned Paul Morphos's work directly as a work

26  _____

27  [6] Defendant acknowledges that, at the very least, Mallet is a "possible
co-author." (Motion, at 20)

28

– 19 –

1   for hire in the context of a motion picture. *Commun. for Creative Non-*
2   *Violence v. Reid*, 490 U.S. 730, 738 (U.S. 1989) (A work for hire
3   agreement exists where a work is specially ordered or commissioned for
4   use as a contribution to a collective work, as a part of a motion picture.).

5       Defendants argument that STV's production agreement with PJM
6   fails for lack of consideration is unavailing. The production agreement
7   is clearly supported by the consideration of payment.  HCT's claim that
8   STV did not pay is tantamount to claim for breach of contract, not lack
9   of consideration.  However, HCT, as a third party with no connection to
10  the STV – PJM agreement, has no standing to assert breach. For *Music*
11  *and Passion*, STV paid $248,180.71 directly and Mr. Kief (as part owner
12  and financier of STV) chose to pay the rest directly on STV's behalf,
13  without any written agreement obliging STV to surrender its rights
14  under the PJM agreement.  SGIMF, ¶ 31. For *Songs from the Seventies*,
15  STV commissioned Mallet's work and paid his fees directly, like with
16  PJM. SGIFM, ¶ 91.  There is no legal basis for HCT to challenge the
17  sufficiency of those payments to PJM now.

18  **IV.**  **<u>Conclusion</u>**

19      Accordingly,  and  for  all  the  foregoing  reasons,  Plaintiff
20  respectfully  requests  that  the  Court  deny  Defendant's  Motion  for
21  Summary Judgment in its entirety.

22

23

24

25

26

27

28

**Stiletto Television, Inc.'s Memorandum of Points and Authorities**
**Fact in Opposition to Hastings Clayton & Tucker, Inc.'s MSJ**

1

2     Dated: April 22, 2019                Respectfully submitted,

3

4                                          **Pierce Bainbridge Beck Price &**

5                                          **Hecht LLP**

6

7                                          By:  _/s/John M. Pierce_

8                                          John M. Pierce

9                                          _Attorneys for Plaintiff Stiletto_

10                                         _Television Inc._

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Stiletto Television, Inc.'s Memorandum of Points and Authorities**
**Fact in Opposition to Hastings Clayton & Tucker, Inc.'s MSJ**