# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| STILETTO TELEVISION, INC., <br><br>                   Plaintiff, <br><br>                      v. <br><br> HASTINGS, CLAYTON & TUCKER, INCORPORATED, et al., <br><br>                   Defendants. | CV 18-3911 DSF (PLAx) <br><br> Order GRANTING Defendant's Motion for Summary Judgment (Dkt. 53) |

   Defendant Hastings, Clayton & Tucker, Incorporated dba Stiletto Entertainment (HCT) moves for summary judgment as to Plaintiff Stiletto Television, Inc.'s (STV) [1] sole claim for declaratory relief concerning ownership of the copyright interest in *Barry Manilow: Music and Passion: Live from Las Vegas* (*Music and Passion: Live*), and *Songs from the Seventies* (the Works).  For the reasons stated below, the motion is GRANTED. [2]

---

[1] The parties use confusingly similar names.  The Court refers to Defendant as HCT and Plaintiff as STV.

[2] HCT also seeks a declaration that it is the proper copyright holder of the disputed works and an order invalidating STV's copyright registration in the disputed works.  HCT cites no authority that filing a motion in the district court is the proper procedure to obtain this requested relief, and it does not identify or apply the legal standard applicable to such relief.  See <u>Kam–Ko</u>

# I.   Undisputed Facts

Plaintiff STV is a California corporation formed in 2004 by Garry Kief, Mark Grove, and Troy Queen.  Dkt. 62, Stiletto Television Inc.'s Statement of Genuine Issues of Material Fact (SGIMF), ¶ 16.[3]  Defendant HCT was founded and managed by Kief.  Id. ¶ 14.

In 2004, Barry Manilow began headlining a Las Vegas concert residency entitled, "Barry Manilow:  Music and Passion" (Music and Passion).  Id. ¶¶ 1-7.  Manilow created Music and Passion in full.  Id. ¶ 8.  Manilow selected the playlist for the show, the staging, and the performance.  Id. ¶ 9.  *Music and Passion: Live*, a concert video, consisted of the filmed 100th and 101st performances of Music and Passion.  Id. ¶ 37.  No material changes to the concert Music and Passion were made for the filmed version.  Id. ¶ 39.  David Mallet directed the cameras, lighting, and stage placement for *Music and Passion: Live*.  Id. ¶ 40.  He ran production during filming and was a producer.  Id. ¶ 43.  Paul Morphos was also a producer of *Music and Passion: Live*, and oversaw preproduction and physical production, including grips and lighting.  Id. ¶¶ 44, 45.[4]  Following production, Mallet

---

Bio–Pharm Trading Co. v. Mayne Pharma (USA) Inc., 560 F.3d 935, 943 (9th Cir. 2009) (recognizing that "a party may not make a *motion* for declaratory relief, but rather, the party must bring an *action* for a declaratory judgment.").  HCT's request is denied.

[3] Where the Court relied on evidence that was the subject of an objection, that objection was overruled.

[4] STV states that Queen made the decision if there were disputes between Morphos and Queen, but the evidence cited does not support this contention.  SGIMF ¶45 (citing Queen Decl. ¶¶32-33 (does not state Queen made decisions or resolved disputes); Morphos Dep. Tr. at 25:25-28:6 (does not support this contention and also states Morphos was hired and paid as lead producer at 28:13-18); Grove Dep. Tr. at 84:18-85:9 (states that Queen was

edited the video with individuals from an affiliated entity, Serpent Productions, Ltd. Id. ¶¶ 35, 47. After the "fine cut" of the video was created, postproduction editing moved to Burbank, California and a third-party vendor assisted in finalizing the sound mixing and syncing of the video. Id. ¶ 49.

Ultimately, three versions of *Music and Passion: Live* were created: a DVD version, an abridged version of the DVD version that appeared on PBS, and another abridged version that was sold internationally. Id. ¶ 50. Queen negotiated contracts with third-parties related to the filming of *Music and Passion: Live*. Id. ¶ 69. STV did not enter into a work made for hire agreement with Manilow for the work on *Music and Passion: Live*. Id. ¶ 55.

In 2016, HCT registered the copyright in *Music and Passion: Live*. Id. ¶ 51. This was the first registration of this work. Id. In 2019, Manilow, Morphos, and Mallet assigned their copyright ownership rights of *Music and Passion: Live*, if any, to HCT. SGIMF ¶¶ 52, 107 (citing Manilow Decl. ¶ 6, Ex. A (Manilow Assignment *Music and Passion: Live*) Kief Decl. ¶ 14 (Morphos Assignment *Music and Passion: Live*); Kief Decl. ¶ 22, Ex. C (Mallet Assignment *Music and Passion: Live*).[5]

*Songs from the Seventies* was a film shoot of songs performed by Manilow in front of a limited audience. SGIMF ¶¶ 91, 95. Unlike

_____

always with Morphos and involved in the budget and figuring out costs); Queen Exs. 17-24 (even if admissible, do not support this contention)).

[5] In its Opposition, STV's then counsel Maxim Price declared: "Though it is not likely, Plaintiff may request additional briefing in the form of a Surreply if relevant discovery is adduced during the remaining two depositions . . . of Garry and Rob Kief." Price Decl. ¶ 2. This statement obviously does not comply with Rule 56(d). The oral request for additional discovery, made at the June 3 hearing, again failed to specify what facts were likely to raise a genuine issue of disputed facts, and is denied.

*Music and Passion: Live*, it was not a preexisting concert and was created from scratch.  Id.  Mallet was hired again to direct the video and worked with Manilow to create the content.  Id. ¶ 92.[6] Manilow controlled the choreography and set list.  Id. ¶ 100 (citing Grove Dep. Tr. at 230:24-231:19; 233:1-20; 234:18-235:1).[7] Morphos was a producer of *Songs from the Seventies*.  Id. ¶ 97. Manilow rejected the initial version of the film, and required substantial edits to be made.  Id. ¶ 105.  Mallet led the portion of postproduction of the film in the United Kingdom.  Id. ¶ 106. Queen and Grove were involved in the business aspects of production.  Id. ¶ 122.  Queen created the contracts involving *Songs from the Seventies* with third-party vendors.  Id. ¶ 123. Queen and Grove were present for production of *Songs from the Seventies*, and Grove was present for postproduction.  Id. ¶¶ 116, 117.

STV did not enter into a work made for hire agreement with Manilow or a written assignment for his work on *Songs from the Seventies*.  Id. ¶ 109, 110.[8]  STV did not enter into a work made for hire agreement with Mallet or Morphos.  Id. ¶¶ 111, 112.[9]

---

[6] STV disputes that HCT hired Mallet and contends that STV hired and paid Mallet directly.  It does not dispute that Mallet directed the video or worked with Manilow to create the content.  Id. ¶ 92.

[7] The evidence cited by STV does not dispute Grove's testimony that Manilow exercised control over the set list and choreography and his involvement with camera placement.

[8] STV purports to dispute that STV did not enter into a work made for hire agreement with Manilow, but the evidence provided does not support STV's position.  See SGIMF ¶ 109.  STV also purports to dispute that STV did not enter into an assignment with Manilow, but provides no evidence.  Id. ¶ 110 (providing no evidence).

[9] STV purports to dispute this, but the cited evidence does not support STV's position.  See SGIMF ¶¶ 111, 112 (both referencing SGIMF ¶ 92, which cites the following:  Queen Decl. ¶¶ 40-48 (states STV hired and paid Mallet

Manilow, Morphos, and Mallet assigned their copyright ownership rights in *Songs from the Seventies*, if any, to HCT.  Id. ¶ 107 (citing Manilow Decl. ¶ 14, Ex. B (Manilow Assignment *Songs from the Seventies*); Morphos Dep., Ex. 11 (Morphos Assignment *Songs from the Seventies*); Mallet Dep., Ex. 70 (Mallet Assignment *Songs from the Seventies*)).  In 2018, STV applied for registration of *Songs from the Seventies* to commence this litigation.  Id. ¶ 115.[10]

## II. Legal Standard

"A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought.  The court shall grant summary judgment if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "This burden is not a light one."  In re Oracle Corp. Sec. Litig., 627 F.3d 376, 387 (9th Cir. 2010).  But the moving party need not disprove the opposing party's case.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Rather, if the moving party satisfies this burden, the party opposing the motion must set forth specific facts, through affidavits or admissible discovery materials, showing that there exists a genuine issue for trial.  Id. at 323-24; Fed. R. Civ. P. 56(c)(1).  A non-moving party who bears the burden of proof at trial as to an element essential to its case must make a showing sufficient to establish a genuine dispute of fact with respect to the

---

directly, but does not mention a written agreement and does not mention Morphos); Queen Decl., Ex. 67 (involves payment of Mallet but no written agreement); Mallet Dep. Tr. at 79:6-11 (not filed with the Court)).

[10] At the same time, STV applied for registration of *Music and Passion: Live*. Compl. ¶ 17.

existence of that element of the case or be subject to summary judgment.  See Celotex Corp., 477 U.S. at 322.

The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  An issue of fact is a genuine issue if it reasonably can be resolved in favor of either party.  Id. at 250-51.  "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury . . . could find by a preponderance of the evidence that the [non-movant] is entitled to a verdict . . . ."  Anderson, 477 U.S. at 252.  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  Id. at 248.

"The district judge is not required to comb the record to find some reason to deny a motion for summary judgment."  Forsberg v. Pac. Nw. Bell Tel. Co., 840 F.2d 1409, 1418 (9th Cir. 1988).  Failure to cite the page and line numbers when referring to deposition testimony "alone warrants exclusion of the evidence."  Orr v. Bank of America, NT & SA, 285 F.3d 764, 775 (9th Cir. 2002), and the Court may, in its discretion, exclude such evidence.  Id.  The same is true for references to an affidavit or declaration.  See id. at n.14.  The court must be directed to "specific, triable facts."  So. Cal. Gas Co. v. City of Santa Ana, 336 F.3d 885, 889 (9th Cir. 2003).  General references to evidence without page or line numbers are not sufficiently specific.  Id.  For example, references to matters set forth in a deposition without designating page and line numbers is not a designation of specific facts.  Orr, 285 F.3d at 774-75.

"If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its

opposition, the court may" deny the motion, defer its consideration allow time to take discovery, or issue another appropriate order. Fed. R. Civ. P 56(d).  If the declaration fails to "identify the specific facts that further discovery would have revealed or explain why those facts would have precluded summary judgment," the court need not defer its ruling.  <u>Tatum v. City and County of San Francisco</u>, 441 F.3d 1090, 1100-01 (9th Cir. 2006).

## III.  Analysis

HCT moves for summary judgment on the grounds that Manilow, Morphos, and Mallet are the only persons who could have held a copyright interest in the Works and that each assigned their copyright interests to HCT.  STV asserts the motion should be denied because HCT's ownership claims are time-barred and the assignments by Manilow, Morphos, and Mallet are not valid.  In the alternative, STV argues that it is a coauthor of the Works or the Works are works made for hire.

### A.      Statute of Limitations

"The Copyright Act of 1976 provides that all civil actions must be brought 'within three years after the claim accrued.'"  <u>Seven Arts Filmed Entm't Ltd. v. Content Media Corp.</u>, 733 F.3d 1251, 1254 (9th Cir. 2013) (quoting 17 U.S.C. § 507(b)).  "When a claim accrues depends on the nature of the copyright claim."  <u>Id.</u> "[C]laims of co-ownership . . . accrue when plain and express repudiation of co-ownership is communicated to the claimant, and are barred three years from the time of repudiation."  <u>Zuill v. Shanahan</u>, 80 F.3d 1366, 1369 (9th Cir. 1996).

STV's argument that this motion should be denied because HCT's claims are time-barred fails because HCT is not the claimant here.  STV provides no authority for its contention that a *defendant* is time-barred from asserting ownership when its

ownership is challenged under 17 U.S.C. § 507(b).  The Court has found none.

## B.   PJM,[11] Manilow, Morphos, and Mallet's Assignments

Ownership of a copyright may be transferred in whole or in part by any means of conveyance.  See 17 U.S.C. §§ 101,  201(d)(1).  But a "transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent."  17 U.S.C. § 204(a).  "No magic words must be included in a document to satisfy § 204(a).  Rather, the parties' intent as evidenced by the writing must demonstrate a transfer of the copyright."  Radio Television Espanola S.A. v. New World Entm't Ltd., 183 F.3d 922, 927 (9th Cir. 1999).  "Section 204's writing requirement is not unduly burdensome; it necessitates neither protracted negotiations nor substantial expense."  Effects Assocs., Inc. v. Cohen, 908 F.2d 555, 557 (9th Cir. 1990).

Manilow, Mallet, and Morphos, on behalf of himself and PJM, assigned their copyright interest in the Works, if any, to HCT.  SGIMF ¶¶ 52, 107.  STV does not dispute that HCT purported to obtain an assignment of rights from Manilow, Mallet, and Morphos; it only disputes the validity of the assignments.  It contends the Manilow, Mallet, and Morphos had no rights in the Works in February 2019 because they previously assigned their rights to STV or their ownership rights had been time-barred for years.  STV does not provide any evidence that Manilow, Mallet, or Morphos assigned their ownership rights to STV before February 2019.  The unsupported assertion is insufficient to raise

---

[11] PJM Productions is Paul Morphos's company.  SGIMF ¶ 44 (citing Morphos Dep. Tr. at 12:9-20).  The parties do not address PJM's involvement and only assert specific factual disputes concerning individuals.  See generally SGIMF.

a genuine dispute concerning the validity of the assignments.  See Anderson, 477 U.S. at 252.  To the extent STV refers to assignment under the work-made-for-hire doctrine, that argument is addressed below.  As for STV's time-bar argument, as stated above, 17 U.S.C. § 507(b) places a limit on when claims may be raised.  Neither Manilow, Mallet, nor Morphos has claimed co-ownership.  It is *STV* that seeks a declaration of ownership of the Works.

STV next asserts that the assignments from Mallet and Morphos are not valid because they were obtained by fraud.  The elements of fraud are (a) a misrepresentation (false representation, concealment, or nondisclosure); (b) scienter or knowledge of its falsity; (c) intent to induce reliance; (d) justifiable reliance; and (e) resulting damage.  Lazar v. Superior Court, 12 Cal. 4th 631, 638 (1996).

STV's assertion is not supported by any evidence concerning Mallet's assignments and is therefore insufficient to raise a genuine dispute.  There is also no evidence to raise a genuine dispute that Morphos's assignments were obtained by fraud; there is no evidence that a misrepresentation was made.[12]  Morphos declares that he assumed he was signing a renewal of assignment of rights but that no one told him it was a renewal.  Morphos Dep. Tr. at 87:21-25-88:1-12.  The assignments are unambiguous as to the rights they confer and to what entity they are assigned.  See Morphos Dep., Ex. 11.  There is no evidence that Morphos was misled into signing the assignments.

---

[12] The testimony cited by STV in SGIMF ¶ 107 does not support the assertion that Morphos' assignment was procured by fraud.

STV has not provided sufficient evidence to create a genuine dispute of material fact that Morphos's or Mallet's assignments are invalid because they were procured by fraud.

## C.   Joint Author

STV asserts the motion should be denied because STV is a joint author of the Works.  Opp'n at 17-18.[13]

"[C]opyright ownership vests initially in the author or authors of the work, which is generally the creator of the copyrighted work."  U.S. Auto Parts Network, Inc. v. Parts Geek, LLC, 692 F.3d 1009, 1015 (9th Cir. 2012) (citation and internal quotation marks omitted).  "A 'joint work' is a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole."  17 U.S.C. § 101.  Being an author requires more than making a creative contribution, even a "valuable and copyrightable" one.  Aalmuhammed v. Lee, 202 F.3d 1227, 1232 (9th Cir. 2000).  An author must have "superintended the whole work," acting as the "master mind" with "creative control."  Id. at 1233 (quoting Burrow-Giles Lithographic Co. v. Sarony, 111 U.S. 53, 61 (1884)).  The parties do not dispute that each of the Works is a "unitary work" within the meaning of 17 U.S.C. § 101.  See Opp'n at 16; Reply at 11.  The issue is whether STV's involvement amounted to co-authorship of the Works.

The Ninth Circuit set forth three criteria for determining whether a work is jointly authored under § 101:

> First, [the Court] determine[s] whether the 'putative coauthors ma[de] objective manifestations of a shared

---

[13] Even if STV could demonstrate a genuine dispute of material fact on this subject, STV's claim for declaratory relief that it is the *sole* author of each of the Works cannot survive summary judgment.

intent to be coauthors.'  A contract evidencing intent to be or not to be coauthors is dispositive.  Second, [the Court] determines whether the alleged author superintended the work by exercising control.  Control will often be the most important factor.  Third, [the Court] analyze[s] whether 'the audience appeal of the work' can be attributed to both authors, and whether 'the share of each in its success cannot be appraised.'

Richlin v. Metro-Goldwyn-Mayer Pictures, Inc., 531 F.3d 962, 968 (9th Cir. 2008) (quoting Aalmuhammed, 202 F.3d at 1234).

### 1.    STV's Contribution in *Music and Passion: Live*

The facts here, viewed in the light most favorable to STV, are insufficient to demonstrate that STV was a coauthor of *Music and Passion: Live.*  STV was one of the producers of *Music and Passion: Live.*  SGIMF ¶¶ 44 (citing Morphos Dep. Tr. 12:9-20).  Queen was in charge of logistics of producing the DVD version of *Music and Passion: Live* and PBS-specific filming and also was in charge of the budget.  See id. ¶ 174; Queen Decl. ¶¶ 32-33.  Queen worked with Morphos and others on the camera plots, budgeting, credits, seating, travel and setlist for the show.  Queen Decl. ¶¶ 32-33; Morphos Dep. Tr. at 94-13 (Morphos stating that he presented Queen with the budget).  Grove brought his own materials to film behind the scenes footage of the concert Music and Passion before the show was available to the public.  SGIMF ¶ 173 (citing Grove Dep. Tr. at 53:11-57:3).  This footage was included in the PBS television special and DVD version (but not the international DVD).  Id. at 54:22; 56: 17-24.  Grove also filmed interviews with Manilow about the show.  Id. 56:1-6.  This footage

was only included in the DVD version.  Id.[14]  Grove was involved in editing the film.  SGIMF ¶ 49.

The evidence of STV's involvement in *Music and Passion: Live* is insufficient to establish it as a joint author absent an agreement.  The parties agree that Manilow created the concert Music and Passion, and that no material changes to it were made when it was filmed.  SGIMF ¶ 39.  The parties also agree that Mallet directed the concerts that were recorded for *Music and Passion: Live* and ran production of the filming.  SGIMF ¶¶ 40, 43.  There is no contract or agreement evincing an intention for STV to coauthor *Music and Passion: Live* with Manilow or Mallet, and STV's involvement amounts to operating logistics, financing, behind the scene footage, and assistance in editing.  There are no citations to testimony or other evidence that either Grove or Queen had artistic control over *Music and Passion: Live* and their contributions fall short of being a "master mind" of the work.  See Aalmuhammed, 202 F.3d at 1234 (plaintiff's substantial and valuable contributions to film, including rewriting certain scenes, directing religious aspects of the movie, and providing technical help insufficient to establish authorship).

### 2.   STV's Contribution to *Songs from the Seventies*

Viewing the facts most favorably to STV, STV's contributions to *Songs from the Seventies* involved pitching the project and negotiating the agreement with PBS, hiring the production crew and director, securing the location of the shoot, and coordinating logistics of the show.  Opp'n at 9 (citing SGIMF ¶¶ 90, 93, 96, 99, 100, 103, 104).  It was also involved in the financial and business

---

[14] STV contends that Grove was involved in the lighting work for production of the filming of the concert.  Opp'n at 6 (citing SGIMF ¶¶ 39, 40).  None of the cited testimony or evidence supports this contention and some of the evidence is completely unrelated.

aspect of the production, provided feedback, and oversaw
important aspects of editing.  SGIMF ¶ 100.

It is undisputed, however, that Manilow created and controlled
the choreography and set list recorded for *Songs from the
Seventies*.  Id. (citing Grove Dep. Tr. at 230:24-231:19; 233:1-20;
234:18-235:1).  That Manilow exercised ultimate control and
authority over the work is evidenced by his rejection of the initial
version filmed, and that he required substantial edits to be made.
Id. ¶ 105.  Manilow's dictates were followed and led to an
intensive postproduction edit.  Id.  It is also undisputed that
Mallet led the part of postproduction in the United Kingdom.  Id.
¶ 106.  While Grove and Queen were also involved in editing,
Grove testified that they would show Manilow the edits for his
approval.  See Grove Dep. Tr. at 245:11-20.  Grove's testimony is
replete with references to Manilow and the control he had over the
ultimate product, including postproduction edits.  The parties do
not dispute this testimony.  SGIMF ¶ 100 (citing Grove Dep. Tr. at
230:24-231:19; 233:1-20; 234:18-235:1).

There is no contract or writing manifesting an intention to
coauthor *Songs from the Seventies*.  The undisputed evidence
shows that Manilow was the master mind of the work, and at
most, shared authorship with Mallet.  There is no cited evidence
that STV had artistic control.  Though STV's contributions were
clearly valuable, valuable contributions (even copyrightable
contributions) are not sufficient to create authorship.  See
Aalmuhammed, 202 F.3d at 1234,

STV has not provided sufficient evidence to create a genuine
dispute of material fact that it is a coauthor of *Songs from the
Seventies*.

### D.   Work Made for Hire and Copyright Transfer

Copyright ownership normally vests in the creator of the work. See U.S. Auto Parts Network, Inc., 692 F.3d at 1015.  But if a work is a work made for hire, "the employer or other person for whom the work was prepared is considered the author . . . , and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright." 17 U.S.C. § 201(b).  A "work made for hire" is either "a work prepared by an employee within the scope of his or her employment; or a work specially ordered or commissioned for use as a contribution to a collective work . . . if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire." 17 U.S.C. § 101.

#### 1.   *Music and Passion: Live*

Regarding *Music and Passion: Live*, STV asserts that PJM hired Mallet and STV hired PJM.[15]  Opp'n at 19.  STV contends it entered into a production agreement with PJM that assigned to STV all rights and interests of the individuals PJM engaged.  Id. Because PJM engaged Mallet, STV argues that pursuant to the production agreement, it acquired Mallet's copyright interests in *Music and Passion: Live*.  Id.

But PJM cannot assign interests it does not own, and hiring alone is insufficient to confer copyright interests under the work made for hire doctrine.  17 U.S.C. § 101.  For Mallet's work to qualify as a work made for hire, Mallet would have needed to execute an express agreement in writing that the work is a work

---

[15] STV does not assert it entered into a work for hire agreement with Manilow.  SGIMF ¶ 55.

made for hire by the entity that hired him—PJM.[16]  Id.; Opp'n at 19 ("Mallet and Serpent were hired by Paul Morphos of PJM."). His work must also have been specially commissioned "for use as a contribution to a collective work, as a part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas."  17 U.S.C. § 101.  There is no citation to a written, executed agreement in the record between PJM and Mallet stating that Mallet's work on *Music and Passion: Live* was a work made for hire or testimony that one ever existed.

If Mallet's work was not a work made for hire, a written agreement is still necessary for Mallet to transfer his copyright ownership to PJM.  Id. § 204(a); Corbello v. DeVito, 777 F.3d 1058, 1062 (9th Cir. 2015).  There is also no citation to any writing evincing Mallet's intent to transfer his copyright ownership to PJM or STV.[17]

In the record is an unsigned draft production agreement between PJM and STV dated January 12, 2006.  Morphos Dep., Ex. 8.  It assigns to STV all rights, title, and interests of any

[16] The Court analyzes only the second prong of the work made for hire doctrine because the parties do not contend that Mallet was an employee of PJM, and there is no evidence in the record that Mallet was PJM's employee.

[17] STV contends that at his deposition, "Morphos also testified that he entered into an agreement with Mallet." Opp'n at 19 (citing SGIMF ¶¶ 35, 36, and 57).  The statement is not supported by any evidence.  Paragraph 35 provides multiple citations to multiple pages of Morphos's deposition testimony, none of which discusses an agreement with Mallet.  Morphos testifies to entering into an oral partnership agreement with Serpent in 2002, but mentions no written agreement.  Morphos Dep. Tr. at 103:2-18. Paragraphs 36 and 57 do not cite any testimony by Morphos other than that they reference paragraph 35.

persons engaged by PJM.  Id. § 5.1.  Also in the record is a November 5, 2005 deal memo signed by STV and PJM, stating that STV is the owner of the "certain music special entitled 'Barry Manilow: Music and Passion." Morphos Dep., Ex. 13 (deal memo). The parties dispute whether an executed version of the production agreement exists and whether the deal memo is sufficient to confer STV ownership of PJM's copyright interest in *Music and Passion: Live*.  This dispute misses the mark.  Because there is no evidence that Mallet ever transferred his interests to PJM or that Mallet's work was a work made for hire, PJM did not own Mallet's copyright interests and could not have assigned them to STV.

STV has not submitted sufficient evidence to raise a genuine dispute of material fact that it acquired Mallet's copyright interest in *Music and Passion: Live* either through assignment or work made for hire.

### 2.   *Songs from the Seventies*

STV asserts that it commissioned Mallet's and Morphos's work directly on *Songs from the Seventies* as a work made for hire. There is no citation to executed agreements in the record between STV and Mallet or STV and Morphos for their work on *Songs from the Seventies*.  There is no cited testimony that either Mallet or Morphos entered into a written work made for hire agreement with STV.[18]

---

[18] STV cites to SGIMF ¶¶ 91, 92, 93 to support its contention that Morphos and Mallet were hired directly by STV.  Opp'n at 8; 20.  The evidence cited in those paragraphs either does not discuss written agreements or is not filed with the Court.  There is no cited evidence for the proposition that "STV commissioned Paul Morphos's work directly as a work for hire in the context of a motion picture."  Id. at 20.

STV has not raised a genuine dispute of material fact that Mallet's and Morphos's work on *Songs from the Seventies* was work made for hire.

## IV. Conclusion

HCT's motion for summary judgment is GRANTED.  Its request for declaratory relief filed together with the motion is denied.

In its Answer, HCT prays for "its costs and attorneys' fees pursuant to, *inter alia*, 17 U.S.C. § 505."  The parties are ordered to meet and confer no later than June 24, 2019 to discuss HCT's entitlement to fees under the appropriate standard, and if so, the amount.  In the absence of an agreement as to entitlement, HCT is ordered to file a brief not to exceed 10 pages supporting its entitlement to fees no later than July 3.  STV may file an opposition not to exceed 10 pages no later than July 10.  A reply of no more than 5 pages may be filed no later than July 17.  If the Court determines that HCT is entitled to fees, it will set a separate briefing schedule as to the amount to be awarded.

IT IS SO ORDERED.

Date: June 17, 2019

Dale S. Fischer
United States District Judge